IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WISCHERMANN PARTNERS, INC., et al., | ) ) ) |
| Plaintiffs/Counter-Defendants, | ) ) |
| v. | ) ) ) |
| NASHVILLE HOSPITALITY CAPITAL LLC, | ) ) ) |
| Defendant/Counter-Plaintiff, | ) ) |
| v. | ) ) |
| PAUL WISCHERMANN, | ) ) |
| Defendant. | ) |

NO. 3:17-cv-00849

JUDGE CAMPBELL
MAGISTRATE JUDGE HOLMES

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to Fed. R. Civ. P. 52(a)(1), the Court makes the following findings of fact and conclusions of law.

**I. INTRODUCTION**

Plaintiff Wischermann Partners, Inc. ("WPI") brings this action against Defendant Nashville Hospitality Capital LLC ("NHC") asserting a claim for breach of contract. In response, NHC filed a counterclaim, asserting claims for breach of contract, gross negligence, breach of fiduciary duty, fraudulent concealment, and fraudulent inducement. NHC also brings claims against Paul Wischermann ("Wischermann") in his individual capacity, asserting breach of fiduciary duty, inducement of breach of fiduciary duty, fraudulent misrepresentation, and fraudulent concealment. The case was tried without a jury on October 1-4, 2019, and October 7-

10, 2019. The parties submitted proposed findings of fact and conclusions of law.[1] (Doc. Nos. 204, 205).

## II. FINDINGS OF FACT

WPI is a hospitality firm that offers hotel consulting and management services with a focus on upper upscale and luxury hotel operations. (Trial Tr., vol. I, 63). Paul Wischermann is the President, CEO, and sole shareholder of WPI. (*Id*. at 269; vol. II, 44). NHC owns the Westin Hotel in downtown Nashville (the "Westin"), located immediately adjacent to the Music City Convention Center. (Doc. No. 64 ¶ 1). Kevin Fee ("Fee") and Seamus Ross ("Ross") are the principal owners and co-Managing Partners of NHC. (Trial Tr., vol. IV, 9).

On December 1, 2013, WPI and NHC entered into a Consulting Agreement regarding the Westin ("Consulting Agreement"). (Pl. Ex. 131). Approximately two months later, in February of 2014, Wischermann began discussions with an existing WPI client – Joel Pizzuti, CEO of Pizzuti Companies – about a Nashville hotel. (Trial. Tr., vol. I, 209; Def. Ex. 240 at PageID # 5099). Wischermann met Pizzuti in 2010, and WPI manages one of Pizzuti's hotels in Columbus, Ohio. (Trial. Tr., vol. I, 80, 87). Wischermann encouraged Pizzuti to build a hotel in Nashville, and made recommendations about brand selection, site location, and hotel tier. (*Id*. at 83, 209).

Pizzuti already had a relationship with Nashville, having attended Vanderbilt University, and refers to Nashville as his second hometown. (*Id*. at 81; Def. Ex. 240 at PageID # 5143-44). Pizzuti decided to build a luxury hotel and picked the hotel site on Fourth Avenue at Korean Veterans Boulevard, a property owned by the Nashville Symphony located across from The Omni

---

[1] The trial transcript is electronically filed at Doc. No. 195 (Vol. I, Oct. 1, 2019), Doc. No. 196 (Vol. II, Oct. 2, 2019), Doc. No. 197 (Vol. III, Oct. 3, 2019), Doc. No. 198 (Vol. IV, Oct. 4, 2019), Doc. No. 199 (Vol. V, Oct. 7, 2019), Doc. No. 200 (Vol. VI, Oct. 8, 2019), Doc. No. 201 (Vol. VII, Oct. 9, 2019), and Doc. No. 202 (Vol. VIII, Oct. 10, 2019).

Hotel in downtown Nashville. (Trial. Tr., vol. I, 84; Def. Ex. 240 at PageID # 5104-05). The Symphony had determined that they wanted to sell the site to potential developers to build a luxury hotel there and made a request for a proposal from hotel developers. (Trial. Tr., vol. I, 84, 85). WPI proceeded to consult with Pizzuti on developing a new luxury hotel at the Symphony site (the "Joseph"). (*Id*. at 86). WPI developed and compiled budgets and proformas for the Joseph, and Wischermann had his architect prepare preliminary floor plans for the Joseph. (*Id*. at 118, 210, 211, 215; Def. Ex. 240 at PageID #5106, 5110). Pizzuti made its submission with the Symphony to build a luxury hotel on the Symphony site on November 13, 2014. (Def. Ex. 240 at PageID #5110-11).

On November 26, 2014, WPI entered into a Management Agreement with NHC regarding the Westin. (Pl. Ex. 90). The Management Agreement provided that WPI would manage and operate the Westin on NHC's behalf. (*Id*. at § 4.3). The Management Agreement contained a non-compete provision:

> 23.29 <u>Non-Competition</u>. Neither Manager nor any Affiliate, successor or assignee of Manager shall, without the prior written consent of Owner, develop, syndicate, finance, own, operate or manage (or grant such rights to third parties), either directly, indirectly or by any means, any other hotel within that certain geographic area described on Exhibit D attached hereto (the "Geographic Zone") of the Hotel but excluding any hotel properties within such Geographic Zone currently under management by Manager.

(*Id*. at § 23.29). The "Geographic Zone" was defined as the "geographic area included in the 1 mile radius of the Hotel." (*Id*. at 56). It is undisputed that the Joseph is located within the Geographic Zone of the Management Agreement's non-compete provision. It is also undisputed that WPI never received NHC's consent to work on the Joseph. (Trial. Tr., vol. I, 218, 219). Wischermann testified that he discussed with Fee and Ross that he was working with Pizzuti on

the concept of developing a luxury hotel on the Symphony site in 2014, while WPI was under the Consulting Agreement with NHC. (*Id*. at 85, 86). Fee and Ross testified that Wischermann did not disclose his ongoing work on the Joseph before executing the Management Agreement in November 2014. (Trial. Tr., vol. IV, 28, 29; vol. V, 15).

Fee testified that he did not discuss the Joseph project with Wischermann until January 2017. (Trial. Tr., vol. IV, 32, 33). Ross testified he did not discuss the Joseph project with Wischermann until February 2017. (Trial. Tr., vol. V, 18). However, on December 18, 2015, Ross responded to an email from a Westin financier concerning the hotel project on the Symphony site stating that "Wischermann tells us that key money is $4m." (Pl. Ex. 11). Ross testified that, despite his statement in the email to the contrary, he did not discuss the Symphony site project with Wischermann before sending the email. (Trial. Tr., vol. V, 17, 18). Wischermann testified that he did discuss key money with Ross. (Trial. Tr., vol. I, 104).

The Management Agreement also contained confidentiality provisions:

> 15.1 Right to Use. Neither party hereto shall use any Confidential or Proprietary Information for any purpose other than with respect to the Construction and Operation of the Hotel pursuant to this Agreement.
>
> 15.3 Ownership and Non-Disclosure. Manager will at all times use all reasonable means to protect the confidentiality of the Confidential and Proprietary Information, use it only for the sole benefit of the Owner and the Hotel and will not communicate or make it available to, or use it for the benefit of, any unauthorized Persons.

(Pl. Ex. 90 §§ 15.1, 15.3). On or around May 11, 2015, Wischermann provided information about the Westin's pre-opening booking pace that was not publicly available to Jones Lang LaSalle to be used in a market study Pizzuti had commissioned for the Joseph. (Trial. Tr., vol. I, 222, 223). Wischermann also provided Pizzuti's team with the amount of NHC's pre-opening budget for the

4

Westin, which Wischerman only had access to based on his work for NHC under the Consulting and Management Agreements. (*Id*. at 243, 244). Additionally, on several occasions between May 2015 and April 2017, WPI provided Pizzuti's architects and other design professionals with technical drawings, plans, photographs, and construction budget figures for the Westin to assist them on the development of the Joseph. (Def. Exs. 26, 27, 31, 36, 37, 39, 42).

WPI entered into a consulting agreement with Pizzuti regarding the Joseph, effective January 1, 2016. (Def. Ex. 11). The Westin opened on October 13, 2016. (Trial. Tr., vol. IV, 28). On or around November 22, 2016, NHC and WPI had the first Owner's Meeting to discuss the Westin's first month of operations. (Trial. Tr., vol. V, 28). During that meeting, Wischermann mentioned that WPI had another hotel project in Nashville. (Trial. Tr., vol. IV, 43). On January 18, 2017, Fee sent the following email to Wischermann:

> Can you please confirm to me if you and your company have any involvement of any kind in any other property in Downtown Nashville? I asked Hubert to confirm back in November but I didn't hear anything from you or your team directly. It has come up again for me and I just need to know of any and all involvement you actually have now or may have in the near future. Can you please confirm this for me so we can properly address this. Thanks.

(Def. Ex. 17). In response, Wischermann called Fee and proposed that they discuss Fee's inquiry in person in February. (Trial. Tr., vol. I, 249, 250; vol. IV, 49). Wischermann did not tell Fee about WPI's Consulting Agreement with Pizzuti concerning the Joseph during the phone call. (Trial. Tr., vol. I, 250). Later that same day, January 18, 2017, Fee and Ross saw an unsigned copy of the Pizzuti Consulting Agreement. (Trial. Tr., vol. VI, 61-63; Def. Ex. 91).

Fee and Ross testified that they then started to think about their options if it became necessary to terminate WPI as manager of the Westin and began discussing the possibility of self-managing the Westin with various Marriott executives after seeing the Pizzuti Consulting

5

Agreement. (Trial. Tr., vol. IV, 55-56, 154; vol. V, 32, 33, 34). On February 14, 2017, Castlerock Hospitality Management LLC was formed for the purpose of managing other hotel projects NHC had in process and to potentially manage the Westin in the event Marriott and NHC's lenders agreed to allow NHC to self-manage. (Trial. Tr., vol. IV, 127).

On February 23, 2017, Fee and Ross met with Wischermann in person. (Trial. Tr., vol. IV, 53). During the meeting, Ross asked Wischermann what was going on with the other property in downtown Nashville. (*Id*.). Fee and Ross testified that Wischermann responded by stating that financing was short and he had not signed any agreement with Pizzuti relating to the Joseph. (*Id*.; Trial. Tr., vol. V, 35). Wischermann denies telling Fee or Ross that he did not have any type of agreement with Pizzuti. (Trial. Tr., vol. I, 158). It is undisputed that Fee and Ross brought up the topic of the non-compete provision in the Management Agreement during the meeting and that Wischermann did not tell them about WPI's Consulting Agreement with Pizzuti concerning the Joseph. (*Id*. at 255).

Fee and Ross testified that in January 2017 they lost trust in Wischermann and WPI and determined WPI could no longer continue managing the Westin because they believed Wischermann repeatedly lied about WPI's work on the Joseph. (Trial. Tr., vol. IV, 61 129, 154; vol. V, 41). At the Owner's Meeting on April 27, 2017, NHC served Wischermann with a Notice of Default which stated that WPI was failing to perform in accordance with the Management Agreement by, among other things, providing substantial assistance with the development of the Joseph without seeking NHC's prior written consent and distributing NHC's confidential information to Pizzuti to assist with the development of the Joseph. (Trial. Tr., vol. I, 167; Def. Ex. 20).

On May 3, 2017, NHC, through counsel, advised WPI that termination of the Pizzuti Consulting Agreement would not cure WPI's months of ongoing violation of the non-compete. (Def. Ex. 22). On May 16, 2017, WPI, through counsel, advised NHC that WPI had terminated its Consulting Agreement with Pizzuti related to the Joseph. (Pl. Ex. 34). On May 19, 2017, NHC, through counsel, reiterated its position that terminating the Consulting Agreement with Pizzuti did not cure WPI's prior violations of the non-compete. (Pl. Ex. 40). NHC's counsel also stated: "Consequently, this will confirm that the Management Agreement will terminate on May 29, 2017, and effective May 30, 2017, your client will no longer be managing the hotel." (*Id.*). On May 23, 2017, WPI filed the complaint in this matter against NHC. (Doc. No. 1). NHC terminated the Management Agreement on May 29, 2017. (Trial. Tr., vol. I, 190).

### III. CONCLUSIONS OF LAW

**A. Breach of Contract**

To establish a breach of contract under Tennessee law, a plaintiff must "prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011). The "cardinal rule" of contract construction under Tennessee law is that "courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles." *Indiv. Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 688 (Tenn. 2019) (citations omitted). Courts "initially determine the parties' intent by examining the plain and ordinary meaning of the written words that are 'contained within the four corners of the contract.'" *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013) (quoting *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011)). "The literal meaning of the contract language controls if the language is clear and unambiguous." *Id*.

"[I]n reviewing a contract for ambiguities, the court considers the contract as a whole." *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 368 F.3d 894, 897–98 (6th Cir. 2004) (citing *Williamson County Broad. Co. v. Intermedia Partners*, 987 S.W.2d 550, 552 (Tenn. Ct. App. 1998)). "'A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. A strained construction may not be placed on the language used to find ambiguity where none exists.'" *Id.* (quoting *Farmers–Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)). "Nor is a contract rendered ambiguous simply because the parties disagree as to the interpretation of one or more of its provisions." *Id.* at 898 (citation and internal quotations omitted).

1. WPI's breach of contract claim

WPI claims that NHC breached the Management Agreement by failing to comply with the termination provisions. NHC argues that it complied with all relevant provisions of the Management Agreement in terminating WPI for cause based on WPI's breach of its obligations under non-compete and confidentiality provisions and that it failed to cure. The pertinent termination provisions in the Management Agreement state:

> 17.1 Owner's General Default Rights. Owner may terminate this Agreement by notice to Manager if Manager fails to perform any of Manager's obligations contained in this Agreement, and such failure continues for a period of thirty (30) days after notice to Manager setting out the failure in reasonable detail. If the failure is such that it cannot reasonably be cured within such thirty (30) days, Owner may not terminate this Agreement as long as Manager begins the cure within the thirty (30) days and proceeds diligently and in good faith to accomplish the cure within sixty (60) days. Manager shall not be entitled to the Termination Fee if this Agreement is terminated as provided in this Section 17.1.
>
> 17.2 Default by Manager – Opportunity to Cure. The following, without limitation, are events of material default by Manager, which entitle Owner, in addition to and cumulative of any and all rights and remedies available to Owner under this

8

> Agreement, at law or in equity, to terminate this Agreement without payment of the Termination Fee upon notice to Manager, subject to the Manager's right to cure. The cure period for any default, unless stated otherwise, is thirty (30) days from the receipt of the notice.
>
> \* \* \*
>
> (c) Failure to comply with: (i) any other material provision of this Agreement; or (ii) a sufficient number of non-material provisions which, collectively, constitute materiality or evidence a disregard for Manager's obligations under this Agreement, provided, however, if such default is such that it cannot reasonably be cured within thirty (30) days, Owner may not terminate this Agreement as long as Manager begins the cure within the thirty (30) days and proceeds diligently and in good faith to accomplish the cure within a period not to exceed sixty (60) days.
>
> \* \* \*
>
> 17.3 <u>Termination Without Cause</u>. Owner, at its option, shall have the right to terminate this Agreement at any time, without cause, by written notice to Manager and payment of the Termination Fee not less than sixty (60) days prior to the termination date.

(Pl. Ex. 90 §§ 17.1-17.3). For the reasons explained below, the Court finds that NHC breached the Management Agreement when it failed to pay WPI the Termination Fee.

*a. NHC did not have cause to terminate under Section 17.1*

Under Section 17.1, NHC could terminate by notice without payment of the Termination Fee if WPI failed to perform any of its obligations contained in the Management Agreement, and such failure to perform continued for a period of thirty days after WPI received notice setting out the failure in reasonable detail. On April 27, 2017, NHC provided written notice to WPI that it was failing to perform in accordance with the noncompete and confidentiality provisions of the Management Agreement by providing substantial assistance with the development of the Joseph without seeking NHC's prior written consent and by distributing NHC's confidential information to Pizzuti to assist with the development of the Joseph. The evidence at trial established that WPI's failures to perform identified in the Notice of Default – assisting with the development of the Joseph and distributing NHC's confidential information to Pizzuti – did not continue for a period

9

of 30 days after April 27, 2017. Rather, the last time WPI shared the Westin's information with Pizzuti was in April 2017, and WPI terminated its Consulting Agreement with Pizzuti concerning the Joseph on May 16, 2017. Accordingly, the Court finds that NHC did not have cause to terminate under Section 17.1 of the Management Agreement.

### b. *NHC did not have cause to terminate under Section 17.2*

Under Section 17.2 of the Management Agreement, NHC was entitled to terminate by notice without payment of the Termination Fee in the event of material default by WPI, subject to WPI's right to cure. A material default under Section 17.2 included WPI's failure to comply with: (i) any other material provision of the Management Agreement; or (ii) a sufficient number of non-material provisions which, collectively, constitute materiality or evidence a disregard for WPI's obligations under the Management Agreement. The Management Agreement is silent as to which provisions are material, and there is no indication within the four corners of the Management Agreement that the parties intended the non-compete or confidentiality provisions to be material. If the parties did view these provisions as material, they could have included provisions to that effect in the agreement.[2] Accordingly, the Court finds that the noncompete and confidentiality provisions were not material provisions of the Management Agreement. *See Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013). The Court further finds that failure to comply with two non-material provisions is not "a sufficient number to collectively constitute materiality or evidence of a disregard" for WPI's obligations under the Management Agreement. Accordingly, the Court finds that there was no event of material default by WPI under

---

[2] While neither party raises the duty of good faith and fair dealing in arguing breach of the Management Agreement, *see Dick Broadcasting Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 668 (Tenn. 2013) (Tennessee law imposes a duty of good faith in the performance of contracts as an implied component of the express terms of performance), NHC waiting four months to serve notice of WPI's defaults also shows lack of materiality of the issues raised in the notice.

Section 17.2 of the Management Agreement. Therefore, NHC did not have cause to terminate under Section 17.2 of the Management Agreement.

       *c.  Section 17.3 required payment of the Termination Fee*

Because NHC did not have cause to terminate the Management Agreement under Sections 17.1 or 17.2, NHC terminated the Management Agreement under Section 17.3. It is undisputed that NHC failed to pay the Termination Fee provided for in Section 17.3. The Court finds that NHC's failure to pay WPI the Termination Fee constitutes a breach of Section 17.3 of the Management Agreement.

    2.  <u>NHC's breach of contract claims</u>

NHC claims that WPI breached the Management Agreement by providing substantial assistance with the development of the Joseph without seeking NHC's prior written consent and by distributing NHC's confidential information to Pizzuti to assist with the development of the Joseph. (Doc. No. 204 ¶¶ 159, 167, 168). NHC produced evidence that the development of the Joseph would likely cause the Westin to lose room nights, amounting to a loss of $3,242,045 in net income between 2020 and 2023. (Doc. No. 204 ¶¶ 136, 137). NHC also produced evidence that the development of the Joseph would likely cause the Westin to reduce room rates, and that the reduced room rates would cause the Westin to lose $291,533 in net room revenue income between 2020 and 2023. (Doc. No. 204 ¶ 138). NHC thus claims that WPI's distribution of NHC's information to Pizzuti and provision of other assistance with the development of the Joseph in 2014-2017, will cause NHC future losses of $3,242,045 in net income from room nights lost to the Joseph and of $291,533 in net income from room revenue lost due to lower room rates. (Doc. No. 204 ¶ 163, 173).

11

Assuming WPI did breach the Management Agreement, NHC has failed to establish that its claimed damages are a result of WPI's breaches. The Symphony wanted a luxury hotel built on that site, (Trial. Tr., vol. I, 84, 85), and Pizzuti would have developed a project in Nashville whether he ever met Wischermann or not. (Def. Ex. 240 at PageID #5144). The evidence does not support a finding that the development of the Joseph was a result of WPI's actions. For the same reasons, NHC's claim for breach of contract brought under the Westin Consulting Agreement also fails.

**B. Tort Claims**

NHC brings counter claims against WPI for gross negligence, breach of fiduciary duty, fraudulent concealment, and fraudulent inducement. NHC also brings claims against Paul Wischermann in his individual capacity for breach of fiduciary duty, inducement of breach of fiduciary duty, fraudulent concealment, and fraudulent misrepresentation. For the reasons explained below, the Court concludes that NHC failed to establish its tort claims.

1. Gross Negligence

"To prevail on a claim of gross negligence in Tennessee, a plaintiff must demonstrate ordinary negligence and must then prove that the defendant acted with utter unconcern for the safety of others, or ... with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law." *Maxwell v. Motorcycle Safety Found., Inc.*, 404 S.W.3d 469, 476–77 (Tenn. Ct. App. 2013) (citations and internal quotations omitted). NHC asserts that WPI acted with gross negligence in performing its duties under the Management Agreement by setting room rates that were too high for the Westin's initial ramp-up period, operating the Spa without a license, and failing to seek franchise fee reductions from Marriott on NHC's behalf. (Doc. No. 204 ¶¶ 200-204). Under Tennessee law, "[c]onduct constituting breach

12

of contract becomes tortious only when it also violates a duty, independent of the contract, arising from wider principles of social responsibility." *Thomas & Assocs., Inc. v. Metro. Gov't of Nashville*, No. M2001-00757-COA-R3CV, 2003 WL 21302974, at *6 (Tenn. Ct. App. June 6, 2003). NHC fails to identify a duty that does not arise from the Management Agreement. Accordingly, it fails to establish the first element of its gross negligence claims. *See Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 763-64 (M.D. Tenn. 2019).

### 2. Breach of Fiduciary Duty

NHC asserts that WPI and Wischermann violated their fiduciary duties by: (1) engaging in conduct directly adverse to NHC's interests by assisting another property owner to develop a competitor property just 1,500 feet away from the Westin; (2) breaching NHC's confidentiality by providing detailed information about the design, development, and operation of the Westin as well as the Westin's pre-opening booking pace and budget to Pizzuti and its contractors to assist with the development of a competitor hotel project; (3) lying to NHC about the fact and nature of WPI's work on the Joseph; and (4) by setting room rates too high for the Nashville market and failing to obtain the necessary massage licenses for the Spa. (Doc. No. 204 ¶¶ 182, 216, 36-80, 88-104). NHC contends that as the direct and probable result of WPI's and Wischermann's disloyal conduct, it is reasonably certain to suffer a loss of $3,242,045 in net income from room nights lost to the Joseph as well as a loss of $291,533 in net income from room revenue lost due to lower room rates caused by the Joseph's entry into the Nashville Market. (Doc. No. 204 ¶¶ 185, 217, 131-138). Accordingly, NHC asserts that it is entitled to recover $3,533,578 as damages for WPI's and Wischermann's breach of fiduciary duty. (Doc. No. 204 ¶¶ 185, 217).

In order to recover for breach of fiduciary duty, a plaintiff must establish: "(1) the existence of a fiduciary duty (2) that was breached (3) proximately causing damages." *Pagliara v. Johnston*

13

*Barton Proctor & Rose, LLP*, 708 F.3d 813, 818 (6th Cir. 2013) (citing *Morrison v. Allen*, 338 S.W.3d 417, 438 (Tenn. 2011)). Even assuming NHC established the first and second elements of its breach of fiduciary duty claims, it has not demonstrated that its anticipated future loss of $3,533,578 net income results from WPI's or Wischermann's disloyal conduct in and before 2017. *See Morrison*, 338 S.W.3d at 438 (citing Restatement (Second) of Torts § 874 ("One standing in a fiduciary relation with another is subject to liability to the other for harm *resulting from* a breach of duty imposed by the relation.")). As noted above, the Symphony wanted a luxury hotel built on its site and Pizzuti would have developed a luxury hotel with or without WPI. While the Joseph may impact the Westin's revenues, NHC has not demonstrated that, more likely than not, WPI's or Wischermann's conduct is the "but for" cause of that impact.[3] For the same reasons, NHC's claim for inducement of breach of fiduciary duty also fails.

### 3. Fraudulent Concealment

"A party commits fraudulent concealment when he or she fails to disclose 'a known fact or condition where he or she had a duty to disclose and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury.'" *Best Choice Roofing & Home Improvement, Inc. v. Best Choice Roofing Savannah, LLC*, 446 F. Supp. 3d 258, 279 (M.D. Tenn. 2020) (quoting *PNC Multifamily Capital Inst. Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 550 (Tenn. Ct. App. 2012)). Under Tennessee law,

> Fiduciary relationship, confidential relationship, constructive fraud and fraudulent concealment are all parts of the same concept. [T]he nature of the relationship which creates a duty to disclose, and a breach of [that] duty constitutes constructive fraud or fraudulent concealment, springs from the confidence and trust reposed by one in another, who by reason of a specific skill, knowledge, training,

---

[3] Given the evidence in the record about the Nashville hotel industry, NHC's claimed future loss is also too speculative in nature. *See Maple Manor Hotel, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 543 S.W.2d 593, 599 (Tenn. Ct. App. 1975) ("'The rule, applicable ... in actions of tort, is that uncertain, contingent, or speculative damages may not be recovered.'") (quoting 25 C.J.S. Damages § 26)).

14

> judgment or expertise, is in a superior position to advise or act on behalf of the party bestowing trust and confidence in him. Once the relationship exists 'there exists a duty to speak...[and] mere silence constitutes fraudulent concealment.'

*Best Choice Roofing*, 446 F. Supp. 3d at 278–79 (quoting *PNC*, 387 S.W.3d at 549-50). NHC asserts that WPI's and Wischermann's willful failure to disclose WPI's work on the Joseph allowed WPI to continue working on the Joseph and to continue using NHC's information to benefit Pizzuti at NHC's expense. (Doc. No. 204 ¶¶ 191, 226). NHC contends that, as a result, WPI and Wischermann directly and proximately caused NHC to suffer a future loss of $3,242,045 in net income from room nights lost to the Joseph and a future loss of $291,533 in net income from room revenue lost due to lower room rates caused by the Joseph's entry into the Nashville market. *Id*. As with its claim for breach of fiduciary duty, NHC has failed to establish that its claimed damages result from WPI's or Wischermann's failure to disclose WPI's work on the Joseph.

### 4. Fraudulent Inducement

To establish its claim for fraudulent inducement, NHC has the burden of proving that WPI (1) made a false statement concerning a fact material to the Management Agreement (2) with knowledge of the statement's falsity or utter disregard for its truth (3) with the intent of inducing reliance on the statement, (4) that the statement was reasonably relied upon, and (5) that an injury resulted from this reliance. *See Baugh v. Novak*, 340 S.W.3d 372, 388 (Tenn. 2011). NHC fails to establish a claim for fraudulent inducement because it fails to point to a false statement concerning a fact material to the Management Agreement. Instead, NHC argues that WPI made an implied assertion that it was performing development services for any other hotel within the non-compete zone at the time of signing the Management Agreement by manifesting its assent to the terms of the Management Agreement. (Doc. No. 204 ¶ 193). This sounds in fraudulent concealment, which the Court has already addressed above.

15

5. Fraudulent Misrepresentation

To recover for fraudulent misrepresentation, "a plaintiff must prove: (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation." *Best Choice Roofing,* 446 F. Supp. 3d at 275 (quoting *Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012)).[4] NHC claims that Wischermann repeatedly and intentionally lied to NHC about the nature and status of WPI's work on the Joseph and about the existence of the Pizzuti Consulting Agreement. (Doc. No. 204 ¶¶ 222, 88-99, 102-104). Even assuming NHC established elements one, two, three, four, and five of its fraudulent misrepresentation claim, NHC has failed to establish the sixth element – that any loss it suffered was proximately caused by Wischermann's purported false representation as to the nature and status of WPI's work on the Joseph.

NHC asserts that, "[a]s a result, [] Wischermann directly and proximately caused NHC to suffer a loss of $3,242,045 in net income from room nights lost to the Joseph [] and a loss of $291,533 in net income from room revenue lost due to lower room rates caused by the Joseph []'s entry into the Nashville market." (Doc. No. 204 ¶¶ 223, 131-138). While the Westin may be impacted by the Joseph, NHC has failed to establish that its claimed damages from that future impact are a result of a Wischermann's representation as to the nature and status of WPI's work on the Joseph before May 2017.

---

[4] Tennessee courts consider "intentional misrepresentation" and "fraudulent misrepresentation" to be different names for the same cause of action. *See id.* (citing *Hodge*, 382 S.W.3d at 342).

16

### C. Damages

The Court finds that WPI is entitled to receive the Termination Fee due under the Management Agreement. The Management Agreement states that the Termination Fee is:

> An amount calculated by multiplying the Average Monthly Management Fee by (A) eighteen (18), during the thirty-six (36) months following the Opening Date; (b) twelve (12), during the period commencing the thirty-seventh (37th) month through the eighty-fourth (84th) month following the Opening Date; and (C) the lesser of: (i) six (6) or (ii) the number of months left in the original stated Operating Term (or any renewal thereof) from the time the termination notice is delivered to the end of the original stated Operating Term or any then-effective renewal thereof, as the case may be, during the period commencing with the eighty-fifth (85th) month following the Opening Date through the end of the original stated Operating Term or any then effective renewal thereof.

(Pl. Ex. 90 at 9). The parties entered proof of the Termination Fee at trial. By WPI's calculation, the Termination Fee due under the Management Agreement amounts to $1,841,145.18. (Trial. Tr., vol. I, 99). NHC argues that the Termination Fee due under the Management Agreement is $1,699,322. (Trial. Tr., vol. V, 119). To reach an accurate determination of the proper amount, WPI shall file a statement of damages that includes an itemized statement of the required calculations.

## IV. CONCLUSION

For the reasons stated, the Court concludes that that NHC breached the Management Agreement and that NHC failed to meet its burden of proof on all of its claims and counterclaims for relief. Accordingly, NHC is liable to WPI for the Termination Fee pursuant to the Management Agreement and WPI is entitled to an award of attorneys' fees.

An appropriate Order shall enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE