IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| WISCHERMANN PARTNERS, INC., et al., | ) ) ) | |
| Plaintiffs/Counter-Defendants, | ) ) | NO. 3:17-cv-00849 |
| v. | ) ) | JUDGE CAMPBELL |
| NASHVILLE HOSPITALITY CAPITAL LLC, | ) ) ) | MAGISTRATE JUDGE HOLMES |
| Defendant/Counter-Plaintiff, | ) ) | |
| v. | ) ) | |
| PAUL WISCHERMANN, | ) ) | |
| Defendant. | ) | |

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court on remand from the Sixth Circuit Court of Appeals for reconsideration of the parties' cross-claims for breach of contract and Defendant/Counter-Plaintiff Nashville Hospitality Capital's counterclaim for breach of fiduciary duty. For the reasons stated herein, upon reconsideration of these claims, the Court finds NHC is entitled to judgment in its favor on the breach of contract claim, and Defendants Wischermann Partners, Inc. ("WPI") and Paul Wischermann (collectively, the "Wischermann defendants") are entitled to judgment on NHC's counterclaim for breach of fiduciary duty.

### I.    PROCEDURAL HISTORY

This case involves a dispute between NHC, a hotel owner and developer, the company NHC hired to help develop and manage one of its hotels, WPI, and WPI's owner Paul Wischermann. NHC and WPI entered into a Consulting Agreement and, later, a Management

Agreement. When the relationship soured, NHC terminated the Management Agreement. WPI sued for breach of contract claiming that NHC terminated the Management Agreement without cause and failed to pay the contractual termination fee. NHC brought counterclaims against WPI for breach of the Consulting Agreement and the Management Agreement, breach of fiduciary duty, gross negligence, fraudulent concealment, and fraudulent inducement. NHC also brought claims against Paul Wischermann for breach of fiduciary duty, inducement of breach of fiduciary duty, fraudulent concealment, and fraudulent misrepresentation.

Following a bench trial, the Court found in favor of WPI and against NHC on the claim for breach of the Management Agreement and ordered NHC to pay WPI the $1,658,044 termination fee. The Court found in favor of the Wischermann defendants on NHC's tort counterclaims: gross negligence, breach of fiduciary duty, and fraud. (*See* Findings of Fact and Conclusions of Law, Doc. No. 208).

On appeal, NHC challenged the Court's conclusions on NHC's counterclaims for breach of contract and breach of fiduciary duty. The Sixth Circuit vacated the judgment and remanded for reconsideration of the claims for breach of contract and breach of fiduciary duty. (Doc. No. 223). Following remand, the parties filed additional proposed findings of fact and conclusions of law addressing those claims and the specific issues identified by the Sixth Circuit. (*See* Doc. No. 228). Now before the Court are the parties' additional proposed findings of fact and conclusions of law (Doc. Nos. 231, 232), responses (Doc. Nos. 233, 234), and replies (Doc. Nos. 235, 236).

## II.    FINDINGS OF FACT[1]

The case was tried without a jury on October 1-4, 2019, and October 7-10, 2019.[2] (Doc. Nos. 204, 205). From the evidence presented at trial, the Court makes the following findings of fact.

NHC, a company founded by Kevin Fee and Seamus Ross, hired Wischermann, the CEO and sole shareholder of WPI, to help develop a new Westin hotel in downtown Nashville, Tennessee. (Vol. IV at 19-20). The parties formalized their relationship on December 1, 2013, by entering into a consulting agreement (WPI Ex. 131). The Consulting Agreement included a confidentiality clause but no restrictions on competition. (*Id*.).

On November 26, 2014, WPI entered into a Management Agreement with NHC regarding the Westin. (WPI Ex. 90). The Management Agreement provided that WPI would manage and operate the Westin on NHC's behalf.   (*Id*. at § 4.3). The Management Agreement contained confidentiality and non-compete provisions. The confidentiality provision stated:

> 15.1 Right to Use. Neither party hereto shall use any Confidential or Proprietary Information for any purpose other than with respect to the Construction and Operation of the Hotel pursuant to this Agreement.
>
> 15.3 Ownership and Non-Disclosure. … Manager will divulge Confidential and Proprietary Information only to Permitted Persons [] or Persons who must have access to such information in order to perform their responsibilities with respect to this Agreement or the Construction or Operation of the Hotel. Manager will at all times

---

[1]    These findings of fact pursuant to Fed. R. Civ. P. 52(a)(1) are in addition to the Court's previously issued findings of fact issued on March 3, 2021 (Doc. No. 208). To the extent the previously issued findings of fact are relevant to the issues addressed in this decision, they are repeated here to aid understanding.

[2]    The trial transcript is electronically filed at Doc. No. 195 (Vol. I, Oct. 1, 2019), Doc. No. 196 (Vol. II, Oct. 2, 2019), Doc. No. 197 (Vol. III, Oct. 3, 2019), Doc. No. 198 (Vol. IV, Oct. 4, 2019), Doc. No. 199 (Vol. V, Oct. 7, 2019), Doc. No. 200 (Vol. VI, Oct. 8, 2019), Doc. No. 201 (Vol. VII, Oct. 9, 2019), and Doc. No. 202 (Vol. VIII, Oct. 10, 2019). For ease of reference, citations to the trial transcript are to the volume and page number as follows: "Vol. [#] at [page]."

> use all reasonable means to protect the confidentiality of the
> Confidential and Proprietary Information, use it only for the sole
> benefit of the Owner and the Hotel and will not communicate or
> make it available to, or use it for the benefit of, any unauthorized
> Persons.

Confidential and proprietary information broadly defined to include: "Guest Data, Hotel Data, and all System Information, whether or not developed by Manager from its own Guest Data or Hotel Data, regardless of whether such are labeled confidential, proprietary, or trade secret." (NHC Ex. 1, Art. 1). Each of these terms is specifically defined in the Management Agreement. (*Id.*). "Guest Data" is defined as "[p]ersonal information, data, and statistics on Hotel guests compiled from information furnished to Manager by Franchisor." (*Id.*). "Hotel Data" is "Guest Data derived from the Operation of the Hotel and the terms and conditions of all leases and other occupancy agreements in effect at the Hotel (if any), together with all material and pertinent information and data obtained, possessed, or generated by Manager in connection with the Operation of the Hotel[.]" (*Id.*). The "Operation of the Hotel" includes virtually everything. "Operation" is defined to include "[a]ll aspects that are customarily the subject of the management and operation of the Hotel, including those with respect to … FF&E, OS&E, …Construction, … Construction, …engineering, …[and] engaging independent contractors[.]" (*Id.*). "Construction" is defined as "[a]ll activities and plans, specifications, drawings, scheme boards and other information with respect to the planning, design, construction, remodeling, redecorating, furnishing, equipping, renovation, rebuilding and replacement of, and additional, alterations, improvements and repairs to the Hotel, including the FF&E, OS&E and interior finishes." (*Id.*). "FF&E" refers to fixtures, furnishings, fittings, and outfittings, decorations and equipment." "OS&E" is operating supplies and equipment such as chinaware, glassware, linens, etc. (*Id.*). "System Information" includes "[a]ll information provided by Manager to Owner in the ordinary

course of business, in any for, including information, knowledge, know-how, drawings, materials, technology, equipment, Marketing plans, strategic plans, methods, procedures, specifications, policy manuals, operating manuals, techniques, computer programs and systems." (*Id.*).

The non-compete provision prohibited the Manager from developing or managing any other hotel within a 1-mile radius unless NHC gives prior written consent. The non-compete provision states:

> 23.29 <u>Non-Competition</u>. Neither Manager nor any Affiliate, successor or assignee of Manager shall, without the prior written consent of Owner, develop, syndicate, finance, own, operate or manage (or grant such rights to third parties), either directly, indirectly or by any means, any other hotel within that certain geographic area described on Exhibit D attached hereto (the "Geographic Zone") of the Hotel but excluding any hotel properties within such Geographic Zone currently under management by Manager.

(*Id.* at § 23.29).  The "Geographic Zone" is defined as the "geographic area included in the 1-mile radius of the Hotel."  (*Id.* at 56).  WPI specifically negotiated the non-compete down from a 3-mile radius to a 1-mile radius so that it could work on other Nashville projects outside of the downtown corridor. (Vol. IV at 23).

The Management Agreement also had detailed rules for contract termination. Under Section 17.3, NHC may terminate the agreement "at any time, without cause, by written notice to [WPI] . . . not less than sixty (60) days prior to the termination date." Section 17.3 requires NHC to pay a substantial termination fee.

The other termination provisions apply if WPI "fails to perform any of [WPI's] obligations contained in th[e] Agreement," or fails to comply with a "material provision" of the agreement or "a sufficient number of non-material provisions which, collectively, constitute materiality or evidence a disregard for [WPI's] obligations."  Under those circumstances NHC may terminate

5

the Agreement without payment of a termination fee if NHC notifies WPI of the unperformed obligation or failure to comply, and "such failure continues for a period of thirty (30) days" after NHC provides notice. These provisions are subject to a 30-day cure period, which must be extended to 60 days under certain circumstances.

The pertinent termination provisions in the Management Agreement state:

17.1 <u>Owner's General Default Rights</u>. Owner may terminate this Agreement by notice to Manager if Manager fails to perform any of Manager's obligations contained in this Agreement, and such failure continues for a period of thirty (30) days after notice to Manager setting out the failure in reasonable detail. If the failure is such that it cannot reasonably be cured within such thirty (30) days, Owner may not terminate this Agreement as long as Manager begins the cure within the thirty (30) days and proceeds diligently and in good faith to accomplish the cure within sixty (60) days. Manager shall not be entitled to the Termination Fee if this Agreement is terminated as provided in this Section 17.1.

17.2 <u>Default by Manager – Opportunity to Cure</u>. The following, without limitation, are events of material default by Manager, which entitle Owner, in addition to and cumulative of any and all rights and remedies available to Owner under this Agreement, at law or in equity, to terminate this Agreement without payment of the Termination Fee upon notice to Manager, subject to the Manager's right to cure. The cure period for any default, unless stated otherwise, is thirty (30) days from the receipt of the notice.
* * *
(c) Failure to comply with: (i) any other material provision of this Agreement; or (ii) a sufficient number of non-material provisions which, collectively, constitute materiality or evidence a disregard for Manager's obligations under this Agreement, provided, however, if such default is such that it cannot reasonably be cured within thirty (30) days, Owner may not terminate this Agreement as long as Manager begins the cure within the thirty (30) days and proceeds diligently and in good faith to accomplish the cure within a period not to exceed sixty (60) days.
* * *
17.3 <u>Termination Without Cause</u>. Owner, at its option, shall have the right to terminate this Agreement at any time, without cause, by written notice to Manager and payment of the Termination Fee not less than sixty (60) days prior to the termination date.

6

At the time the parties entered into the Management Agreement, Wischermann was also working with another client, Joel Pizzuti, to develop a hotel in downtown Nashville. (Vol. I at 84). Although WPI and Pizzuti did not have a formal consulting agreement until January 1, 2016 (*see* NHC Ex. 11), they began working on the Nashville hotel project in February 2014, approximately two months after NHC and WPI signed the Consulting Agreement. (Vol. I at 209; Def. Ex. 240 at PageID# 5099).

Wischermann made recommendations about brand selection, site location, and hotel tier. (Vol. I at 83, 209). Pizzuti decided to build a luxury hotel, "The Joseph," on Fourth Avenue at Korean Veterans Boulevard in downtown Nashville, a few blocks from the Westin. (Vol. I at 84; Def. Ex. 240 at PageID# 5104-05). WPI proceeded to consult with Pizzuti on The Joseph. (Vol. I at 86). WPI developed and compiled budgets and proformas for The Joseph, and Wischermann's architect prepared preliminary floor plans. (Vol. I at 118, 210-211, 215; Def. Ex. 240 at PageID# 5106, 5110).

As part of Wischermann's assistance to Pizzuti on The Joseph project, Wischermann shared "all kinds of information about the Westin" with Pizzuti and his team. This included information that was publicly available: schematics of the hotel, detailed technical drawings, plans, and "pretty much anything you could imagine about the hotel being built"; and information that was not: pace rate, group booking, and ADR. (Vol. I at 110; Vol. III at 49-77, 124-28, 148-50; NHC Exs. 26, 27, 31, 36, 37, 39, 42, 43). As a result of the information provided by WPI, Pizzuti and his contractors were able to save time and money. (Vol. III at 128 (stating that "the Pizzuti people" did not have to go to the planning board to obtain these documents)). NHC's expert, Charles Pinkowski, testified that "[t]he knowledge learned by the Pizzuti development team for

having access to this information would speed up the development process, save money and assist The Joseph to be a better competitor in the local market." (Vol. VII at 47).

The parties dispute when and how Wischermann disclosed his work on The Joseph to NHC. Wischermann claims he told NHC about his work on The Joseph project "right at the beginning" – sometime in 2014. (Vol. I at 101). But Fee and Ross denied knowing that Wischermann was working with Pizutti on The Joseph and testified that they first learned of the project in November 2016 when Wischermann mentioned that he had "another project in Nashville." (Vol. IV at 43, 139; Vol. V at 111). Ray Waters, who initially managed the Westin, testified that Fee and Ross reacted with "utter disbelief" when he showed them WPI's consulting agreement with Pizutti in January 2017. (Vol. IV at 63; Vol. V at 18).

But other evidence supports the conclusion that even if Fee and Ross did not know that WPI had a signed agreement with Pizutti, they knew Wischermann was working with Pizzuti on The Joseph, though perhaps not by that name, before November 2016. For example, in December 2015, Ross received an email from Quiwei Chen, who worked for one of the lenders on the Westin project. (WPI Ex. 11). In the email, Chen asked, "Hey guys, any intel on this new 300 room project being planned by the Omni? Looks like it is also with Starwood and Wischermann," and included a link to a business journal article. (WPI Ex. 11). Ross responded that Wischermann told them that "they have applied for and got key money for a Luxury Collection Hotel" and "engaged an architect." (WPI Ex. 11).

In July 2016, Wischermann, Pizzuti, and a representative of Starwood hotels (at the time, Starwood owned the Westin and The Joseph brands) met with the Office of the Mayor of Nashville to give an overview of The Joseph project. (Vol. I at 105). After the meeting with the mayor, Wischermann, Pizzuti, and a representative of Starwood hotels "took a tour" of the Westin, which

was still under construction. (*Id*.). During the tour, the group encountered Ross. (*Id*. at 106). Ross became very angry that Wischermann was showing the property to "a potential competitor" and "shar[ing] confidential information." (Vol. V at 22-24). He testified that he was "excessively angry" because a few weeks before that Wischermann had shared pricing information for the Westin without informing NHC. (*Id*. at 23). He was also upset and felt it was a breach of trust for Wischermann to bring the Starwood representative to the Westin without informing NHC because they had been trying to contact that representative. And Ross felt that having the Starwood representative, who they had been trying to get in touch with, visit without informing NHC was a breach of trust. (*Id*.).

Later that day Ross spoke with his sister about his encounter with Wischermann and Pizzuti. After that conversation, Ross's sister sent him an email in which she stated that she had read through the contract with Wischermann and she told him, "To me it is clear as day that he in the breach of Section 23.29 (non-competition) & 15.1 (hotel data). You must give him 30 days to cure. Regardless whether he severs the operating contract with the Luxury Collection, he has shared the confidential information with a third party & he would not be able to cure this." (WPI Ex. 97). The email also addressed Wischermann's potential removal: "I think if you are still thinking of proceeding with his removal, it is about securing the word of Ray [Waters], then going to have a discussion with Starwood Head Office & setting out the next steps with them & then going back to your 5/6 key department managers to secure them in the changeover." (*Id*.).

The Westin opened a few months later on October 13, 2016. (Vol. I at 139). On or around November 22, 2016, NHC and WPI had the first Owner's Meeting to discuss the Westin's first month of operations. (Vol. II at 100, 103; Vol. IV at 42-44; Vol. V at 28). During that meeting, Wischermann mentioned that WPI had another hotel project in Nashville. Following the meeting,

9

Hubert Worrell, CFO of NHC, emailed Brian Hutchins, director of operations at WPI, asking: "There was another hotel project mentioned in the meeting. What is WP's involvement in the project? And what is the status of the project?" (*See* WPI Ex. 9; NHC Ex. 73). Hutchins responded: "[N]ot sure what you mean about another WP project mentioned yesterday. Can you explain." (*Id.*). The email discussion did not proceed beyond that.

Two months later, on January 18, 2017, Fee sent the following email to Wischermann:

> Can you please confirm to me if you and your company have any involvement of any kind in any other property in Downtown Nashville? I asked Hubert to confirm back in November but I didn't hear anything from you or your team directly. It has come up again for me and I just need to know of any and all involvement you actually have now or may have in the near future. Can you please confirm this for me so we can properly address this. Thanks.

(NHC Ex. 17). In response, Wischermann called Fee and proposed that they discuss the matter in-person in February. (Vol. I, 249-50; Vol. IV at 49). Wischermann did not tell Fee about WPI's Consulting Agreement with Pizzuti during that telephone call.[3] (Vol. I at 250). Later that same day, a former WPI employee who was then working for one of Fee and Ross's companies, gave Fee and Ross an unsigned copy of a consulting agreement between WPI and Pizutti. (Vol. IV at 9; Vol. VI at 61-63; NHC Ex. 91).

Fee and Ross testified that they then started to think about their options if it became necessary to terminate WPI as manager of the Westin and began discussing the possibility of self-managing the Westin. Self-management would require approval of Marriott. (Vol. IV at 55-56, 154; Vol. V at 32-34). On February 14, 2017, Fee and Ross formed their own hotel management company – Castlerock Hospitality Management LLC. This company would manage other NHC

---

[3] Fee testified that Wischermann told him that he had not signed an agreement or done any real work on the project because there was a gap in financing. (Vol. IV at 49). Wischermann testified only that he didn't tell Fee about the consulting agreement during the phone call and that Fee knew about the consulting agreement "all along." (Vol. I at 250).

hotel projects and, if Marriott and NHC's lenders agreed to allow NHC to self-manage, would also manage the Westin. (Vol. IV at 127).

On February 23, 2017, Fee and Ross met with Wischermann in person. (Vol. IV at 53). During the meeting Fee and Ross raised concerns about the non-compete and WPI's involvement with The Joseph. (*Id.*; Vol. I at 158, 255). The parties' recollections of the details of the discussion differ. Fee testified that Wischermann told them he had not signed an agreement relating to The Joseph. (Vol. IV at 53). Wischermann denied having said that. He testified that he did not tell Fee or Ross that he had a Consulting Agreement for The Joseph, but also never told them that he did not have one. (Vol. I at 158, 255).

At the Owner's Meeting on April 27, 2017, NHC served Wischermann with a Notice of Default which stated that WPI was failing to perform in accordance with the Management Agreement by, among other things, providing substantial assistance with the development of the Joseph without seeking NHC's prior written consent and distributing NHC's confidential information to Pizzuti to assist with the development of the Joseph. (NHC Ex. 20; Vol. I at 167). Fee and Ross testified that by that time they had lost trust in Wischermann and WPI, believed Wischermann repeatedly lied about WPI's work on The Joseph, and determined WPI could no longer continue managing the Westin. (Vol. IV at 61, 129; Vol. V at 41). Thus began an exchange of letters between counsel for the parties.

On May 1, 2017, WPI responded through counsel that WPI would take steps to terminate the consulting agreement with Pizzuti related to The Joseph even though it did not believe the consulting agreement violated the non-compete clause. (WPI Ex. 30). WPI denied the accusation that it "shared any Confidential or Proprietary Information" as "completely without merit" and stated that "Wischermann has not shared any Confidential or Proprietary Information." (*Id.*). WPI

11

iterated its intent to cure, stating that it was "confident it [could] promptly resolve any perceived defaults" and "either has already or will immediately act to cure the perceived defaults outlined in the letter." (*Id*.).

On May 3, 2017, NHC responded that "termination of the Pizzuti agreement does not cure months of ongoing violation of a non-compete. The damage has been done and cannot be undone by a termination with Pizzuti Group now." (WPI Ex. 43).

On May 16, 2017, WPI notified NHC that "effective today" WPI "terminated its consulting agreement with the Pizzuti Group related to a prospective hotel in downtown Nashville." (WPI Ex. 34). In the letter, WPI asserted that "as a result, all alleged breaches noticed 'in reasonable detail' in [NHC's] correspondence have been cured." (*Id*.). WPI asked NHC to confirm no later than May 19, 2017, that it "no longer intends to proceed with its plan to usurp Wischermann's Management role at the Westin Nashville on May 29, 2017."

NHC responded on May 19, 2017, by advising WPI that it "has not cured their defaults under the Hotel Management Agreement…" and that "merely terminating the consulting agreement [WPI] has admitted it entered into with the Pizzuti Group now does not cure months of an ongoing violation of a non-compete. That damage to NHC and to the parties' relationship cannot be undone by a simple termination of the consulting agreement now." (WPI Ex. 40). NHC informed WPI that "consequently, [] the Management Agreement will terminate on May 29, 2017, and effective May 30, 2017, [WPI] will no longer be managing the hotel." (*Id*.).

On May 23, 2017, WPI filed the complaint in this matter against NHC. (Doc. No. 1).

# III. CONCLUSIONS OF LAW

## A. Breach of Contract

The parties assert cross-claims for breach of the Management Agreement. WPI claims NHC breached the Management Agreement by failing to comply with the termination procedures set forth in Section 17.1, 17.2, and 17.3, including failure to pay the termination fee. NHC claims WPI breached the Management Agreement by providing NHC's confidential and proprietary information to Pizzuti and otherwise assisting in the development of The Joseph and that NHC, therefore, had the right to terminate the Management Agreement without paying the termination fee.

### 1. Bench Trial Verdict

Following the bench trial, the Court found in favor of WPI on the breach of contract claim. Specifically, the Court found that the Management Agreement allowed for termination "without payment of the termination fee if WPI failed to perform any of its obligations contained in the Management Agreement, and such failure to perform continued for a period of thirty days after WPI received notice setting out the failure in reasonable detail." (Doc. No. 208 at 9). The Court found that "the failures identified in the Notice of Default – assisting with the development of the Joseph and distributing NHC's confidential information to Pizzuti – did not continue for a period of 30 days after April 27, 2017." (*Id*.). Finding that WPI had thereby cured its breaching activity, the Court concluded NHC did not have cause to terminate under Section 17.1. (*Id*. at 9-10).

The Court also found that NHC did not have cause to terminate under Section 17.2 of the Management Agreement. (Doc. No. 208 at 10-11). Under Section 17.2, NHC was entitled to terminate by notice without payment of the termination fee only if WPI breached a material provision of the agreement or "a sufficient number of non-material provisions which, collectively,

13

constitute materiality or evidence disregard for Manager's obligations under [the] Agreement." (*Id*.). The Court found that the non-compete and confidentiality provisions were not material, reasoning that if these the parties viewed these provisions as material, "they could have included provisions to that effect in the agreement." (*Id*. at 10). The Court also found that the "failure to comply with two non-material provisions is not 'a sufficient number to collectively constitute materiality or evidence of a disregard' for WPI's obligations under the Management Agreement. (*Id*.). Because the Court found that the breaches were not material alone or in combination, it did not reach the issue of cure under Section 17.2. (*Id*. at 10-11). Because NHC lacked cause to terminate under Sections 17.1 and 17.2, the only remaining avenue for termination was for termination without cause under Section 17.3, which required payment of a termination fee. (Id. at 11). The Court found NHC's failure to pay the termination fee was a breach of the Management Agreement. (*Id*.).

    2.  <u>Appeal</u>

On appeal, NHC challenged the Court's ruling on WPI's breach of contract claim. The Sixth Circuit disagreed with the Court's analysis of "cure" and "materiality." With regard to "cure," the Sixth Circuit noted that cure "often requires both prospective action (preventing future wrongdoing) and retrospective action (addressing past wrongdoing). (Doc. No. 223 at 11 (citing Cure of Default, Black's Law Dictionary (11th ed. 2019)). "[B]ecause the district court's findings of fact never discussed what efforts (if any) Wischermann and WPI made to correct their alleged breaches of confidentiality and non-competition," the Sixth Circuit remanded for this Court "to evaluate whether Wischermann and WPI expended any effort to cure their alleged prior breaches of confidentiality and non-competition, and, if so, whether those efforts 'corrected' or 'made right' their breaching activity." (*Id*. at 12).

In addition, the Sixth Circuit held that the Court's analysis concerning materiality was legal error because it relied on a single factor – that the agreement did not expressly label the confidentiality and non-compete provisions as "material" – and failed to consider and apply the "litany of factors" identified by the Tennessee Supreme Court in *State v. Howington*, 907 S.W.2d 403, 410-11 (Tenn. 1995). (Doc. No. 223 at 12-13). The Sixth Circuit instructed the Court to reconsider whether the materiality of the non-compete and confidentiality provisions applying the *Howington* factors. (*Id*.).

With these directives in mind, the Court proceeds to reconsider "cure" and "materiality," beginning with "materiality."

### 3. Materiality

In determining whether a failure to perform is material, the Court considers a number of factors, including: "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account all of the circumstances including any reasonable assurances; [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." *Howington*, 907 S.W.2d at 410-11 (quoting Restatement (Second) of Contracts § 241 (Am. L. Inst. 1981)); *see also Tennessee Homes v. Welch*, 664 S.W.3d 1, 9 (Tenn. Ct. App. 2022) (noting that "it is the 'clear trend' of Tennessee courts 'to apply the test found in section 241 of the Restatement (Second) of Contracts'"). Generally, the first two factors are the most important. *Madden Phillips Const., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 823 (Tenn. Ct. App. 2009). Tennessee courts

15

have recognized, however, that sometimes "these factors are only marginally helpful in analyzing the materiality." *Tennessee Homes*, 664 S.W.3d at 9 (quoting *M&M Elec. Contractor, Inc. v. Cumberland Elec. Membership Corp.*, 529 S.W.3d 413, 423 (Tenn. Ct. App. 2016)).

Technically, these factors relate to whether the breach of the agreement was a material breach, whereas the contract provision refers to failure to comply a "material provision of th[e] Agreement." This distinction aside, generally, only a material breach will relieve a party of its obligations under an agreement. *Id.* ("[I]n order for a contractual breach to be sufficient to relieve the non-breaching party of its contractual obligations, the initial breach must be 'material.'") (quoting *M&M Elec.*, 529 S.W.3d at 423). Therefore, the Court will consider both the materiality of the confidentiality and non-compete provisions and the materiality of the breaching conduct.

Generally, if the provision itself is not material, a breach of the provision is not a material breach. The Agreement, however, also provides that NHC can terminate if WPI fails to comply with "a sufficient number of non-material provisions which collectively constitute materiality or evidence a disregard for Manager's obligations under this Agreement." Thus, even if the confidentiality and non-compete provisions are not material standing alone, if breach of these provisions "collectively constitute[s] materiality," NHC may terminate the Management Agreement without paying the termination fee. Accordingly, the Court also considers whether the breaching conduct is material when taken together.

  a. *The extent to which the injured party will be deprived of the benefit which he reasonably expected*

NHC argues WPI's breach of the non-compete and confidentiality provisions deprived NHC of two core benefits of its bargain: (1) that WPI would develop and manage the Westin free and clear of any involvement with another WPI client within downtown Nashville; and (2) that WPI would not disclose confidential and proprietary information regarding the Westin to another

16

hotel owner. (Doc. No. 231 at 12). NHC states that the parties specifically negotiated the geographic area covered by the non-compete provision to a radius of one mile down from a larger area initially proposed by NHC. (*See* Vol. IV at 23; Vol. VIII at 118).

NHC argues that WPI provided extensive and ongoing assistance to Pizzuti on The Joseph and shared "all kinds of information about the Westin with third parties," including Pizzuti and others at The Joseph. This included information about "pace rate, group booking, and ADR" that was not publicly available. WPI also provided detailed technical drawings, plans, photographs, and construction budget information to Pizzuti's contractor, architects, and design professionals to assist them in budget and design. (NHC Exs. 26, 27, 31, 36, 37, 39, 42, 43; Vol. III at 49-77, 124-28, 148-50).

WPI contends NHC was not deprived of the benefit it reasonably expected to receive because it received "the entirety of what it bargained for – advice and counseling that was essential for NHC to acquire the Westin brand, get the hotel up and running, and managing the hotel." WPI claims that it did a good job in managing the hotel – the Westin exceeded budget in revenue and profit. In fact, WPI argues NHC actually received more than it paid for because it undercharged for preopening services expecting to profit by managing the hotel after it was up and running.

Ultimately, this factor is neutral. On one hand, NHC intended to hire a consultant and manager who was not also working for competitors in the same immediate area and not sharing NHC's information with anyone, let alone competitors in the same immediate area. The fact that WPI and Wischermann were not only working to develop another hotel but were actively providing confidential and proprietary information to that hotel to assist in its development only compounds the injury. This is not a situation where WPI was working with another hotel in downtown Nashville in violation of the non-compete provision but took measures to insulate its

17

work on the projects – perhaps using separate teams of people and implementing systems to prevent sharing of proprietary information. Instead, WPI's work with Pizzuti and The Joseph involved a troubling combination – WPI, including Wischermann himself, working on both projects, and WPI took information from one client – NHC – and gave it to another client to help the other client. On the other hand, WPI otherwise performed under the Management Agreement and the Westin was profitable.

On the whole, NHC got some, but not all of what it bargained for. It got a hotel manager. It did not get a conflict-free hotel manager, and it did not get a hotel manager that guarded NHC's confidential and proprietary information as it was required to do under the terms of the Management Agreement. This factor weighs in favor of finding that the non-compete and confidentiality provisions are material, particularly when taken together.

      *b.   The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived*

NHC argues it would be difficult to quantify the harm from materially aiding another owner to develop a competing hotel 1,500 feet away over a period of several years and using NHC's confidential information to do so. WPI argues there was no harm from the breach, so the adequate compensation is quantifiable at zero.

The Court agrees with NHC that the harm from the breach is difficult to quantify and therefore difficult to adequately compensate. Indeed, it seems virtually impossible to assign a dollar amount to the harm caused by breach of the non-compete and years of sharing NHC's confidential and proprietary information. At a minimum, one could say that the confidential and proprietary information at least had the value Pizzuti would have assigned it. It's clear that Pizzuti did not view the information as valueless. For example, an email from WPI's VP of Sales, Erik Benson, suggests the information was valuable. On February 16, 2016, he wrote an email to

18

Wischermann stating: "I had a chance to review [the pro forma for the Joseph Nashville] in depth tonight, and I think it looks pretty solid overall, especially with the intel we have from TWN's group pace and ADR trend for future years." He added, "I actually think you could start Year 1 higher than $301.85 – given what we know about TWN and the market." (WPI Ex. 15; Vol I at PageID# 3504). While some information about market rates was public, the Westin's group pace (the group bookings) was not public information. (Vol. I at 234).

Given the volume and nature of the information shared, it would be difficult to adequately compensate NHC for the value of the information alone, let alone determine appropriate compensation for sharing it with and assisting Pizzuti with development of The Joseph. Even if The Joseph would have been built without NHC's information or Pizzuti's development assistance, that does not render the assistance or the information valueless. Rather, it underscores why the breach is difficult to compensate.

This factor weighs in favor of finding materiality.

> ### c. the extent to which the party failing to perform or to offer to perform will suffer forfeiture if the failure is treated as material

This factor concerns whether the party who fails to perform has relied substantially on the expectation of the exchange, for example, by preparation or performance, and a finding that the failure is material would result in forfeiture. For this reason, "a failure is less likely to be regarded as material if it occurs late, after substantial preparation or performance, and more likely to be regarded as material if it occurs early, before such reliance." Restatement (Second) of Contracts § 241, *cmt. d.*

WPI says it would suffer "almost complete forfeiture" if the alleged breaches are deemed material and it is not paid the termination fee, because it lost $662,150 in the initial and pre-management phase and was relying on the term of the contract to recoup these losses and turn a

19

profit. (Doc. No. 232 at 24 (citing Vol. I at 195-196)). NHC argues any forfeiture WPI suffers is a natural consequence of its own actions. (Doc. No. 231 at 17). Moreover, the breaching conduct occurred throughout the duration of the Management Agreement.

The evidence shows that WPI and Wischermann anticipated recouping costs and making a profit over the term of the contract. Unless the termination fee is paid, they will forfeit the remaining years left on the Management Agreement. This, however, is not complete forfeiture because NHC paid WPI over $1.5 million dollars in fees for development services, pre-opening services, and management services, and additional amounts for reimbursements of travel expenses and salary allocations. (Vol. 5 at 118-119).

    *d.   The likelihood that the party failing to perform or offer to perform will cure his failure, taking into account all of the circumstances including any reasonable assurances*

WPI argues this weighs in its favor because it ended the relationship with Pizzuti and asked NHC what additional remedies it requested. NHC argues this factor weighs in favor of finding a material breach because although WPI ceased its breaching conduct, to the extent it was possible to effect a cure, WPI made no effort to do so.

As discussed in more detail below. WPI did not and likely could not have fully cured the breach of the non-compete and confidentiality clauses. In any event, other than terminating a development agreement with Pizzuti and stating that it intended to cure any alleged default, WPI made no other efforts to remedy the breaches.

    *e.   The extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing*

This factor is akin to a finding of willfulness. Restatement (Second) of Contracts § 241, *cmt. f.* Either way, this factor is not particularly probative of materiality given that one can act in good faith and nevertheless commit a material breach and vice versa. The Court finds, however,

that to the extent it is relevant to the materiality determination, Wischermann, at best, ignored his obligations under the non-compete and confidentiality provisions. Even if he did not hide his relationship with Pizutti, Wischermann made no effort to comply with the non-compete provision by seeking written consent before he started working with Pizzuti on The Joseph and, when NHC asked him directly about his work with Pizzuti, he obfuscated. Moreover, Wischermann and others at WPI treated NHC's confidential and proprietary information as their own and freely distributed it to third parties without regard for the confidentiality clause. Under these circumstances, the Court finds Wischermann and WPI did not comport with the standards of good faith and fair dealing.

Considering the foregoing factors, the Court finds that the confidentiality and non-compete provisions are material provisions of the agreement. Even if these provisions are not material individually, when considered together, the failure to comply with these provisions is collectively material and evidences a disregard for WPI's obligations under the Agreement.

Therefore, WPI was in default under the agreement pursuant to Section 17.2(c) and NHC was entitled to terminate the Management Agreement without paying the termination fee subject to WPI's right to cure. Whether Wischermann and WPI cured the breaches is the next area of reconsideration.

4. Cure

As discussed above, the Court previously found that WPI and Wischermann cured any ongoing breaches when they terminated the consulting agreement with Pizzuti. The Sixth Circuit ordered the Court to consider whether WPI and Wischermann "expended any effort to cure their alleged prior breaches of confidentiality and non-competition, and, if so, whether those efforts 'corrected' or 'made right' their breaching activity." (*Id*. at 12).

21

"Cure" requires more than merely ceasing the non-compliant conduct, it must "correct a failure to perform," which requires both prospective action (preventing future wrongdoing) and retrospective action (addressing past wrongdoing). (Appeal at 12 (citing *Black's Law Dictionary* (11th ed. 2019)). In other words, "the right to cure sometimes requires the breaching party to both abstain from future breaching activity and also to undo or diminish the consequence of its prior failure(s) to perform." *Id*. ("In some instances, a breaching party must do more than stem the bleeding; it must work to correct the damages already done.").

NHC argues that WPI did not make any efforts to cure its breach of the non-compete and confidentiality provisions beyond terminating the Pizzuti Consulting Agreement. (Doc. No. 231 at 7 (citing Vol II at 45)). WPI never asked Pizzuti or its architects, designers, engineers, and contractors to return and not use confidential and proprietary information about the Westin that WPI had shared. NHC acknowledges that it may not have been possible for WPI to fully cure the breach due to the extent and longevity of WPI's assistance to Pizzuti. Indeed, NHC advised WPI as much on May 3, 2017, and again on May 19, 2017, at which point WPI still had more than a week left in the cure period. (NHC Ex. 22; WPI Ex. 40 (advising that "merely terminating the consulting agreement … with the Pizzuti Group now does not cure months of an ongoing violation of a non-compete"). NHC suggests that WPI and Wischermann's failure to even attempt to cure the breach was likely because Wischermann understood the breach could not be fully cured. (Doc. No. 231 at 10-11). NHC adds that WPI filing this lawsuit before NHC terminated the agreement and before the cure period had elapsed suggests that WPI had no intent to make any further efforts to cure.

WPI contends that is satisfied its obligation to cure because it "fully and immediately complied with the cure demand that NHC made, took additional action with respect to NHC's cure

22

request, and those actions by WPI corrected or made right the alleged breaches that NHC identified." (Doc. No. 232 at 18). WPI states that the Notice of Default letter did not demand or even request WPI to retrieve any information whatsoever from The Joseph or Pizzuti, nor did it say that WPI's failure to do so would constitute a breach. (*Id*. at 19). WPI claims it repeatedly communicated to NHC that it would "take whatever action NHC deemed necessary to effect a cure" and "specifically asked NHC to identify any other action NHC believed necessary for WPI to fully cure the alleged breaches." (*Id*. (citing WPI Exs. 30, 32, 34, 42, 45)). WPI argues NHC did not identify any additional actions to cure the breach because it had already decided to terminate the contract with WPI and replace it with Castlerock. (*Id*.). Essentially, WPI and Wischermann argue that they fully cured the breaches because NHC did not demand any specific curative action.

In addition, WPI now argues that it was not necessary to attempt to retrieve any information given to Pizzuti and others because "the information was de minimis, old, publicly available, and of no demonstrative competitive use to Pizzuti or The Joseph." (Doc. No. 235 at 5). Tellingly, when NHC first notified WPI and Wischermann of the default, they responded through counsel that "NHC's accusation that Wischermann has shared any Confidential and Proprietary Information is completely without merit. Wischermann has not shared any Confidential or Proprietary Information." (NHC Ex. 21).

Finally, Wischermann and WPI argue that any actions WPI "did or could do to cure" would not matter because NHC had decided to terminate the contract irrespective of cure. (Doc. No. 235 at 5). To the extent this is intended to suggest that cure is irrelevant to the breach of contract claim, this argument is misplaced. Even if cure would not have affected NHC's decision to terminate the

23

Management Agreement, whether WPI cured or at least began to cure within the allotted time period is affects WPI's right to a termination fee.

As discussed above, there is no dispute that WPI and Wischermann breached the non-compete and confidentiality provisions of the Management Agreement by providing confidential and proprietary information to Pizzuti and otherwise assisting Pizzuti in the development of The Joseph. WPI concedes that it took no action to cure or attempt to cure these breaches other than cancelling its agreement with Pizzuti, which only served to prevent future harm, and asking NHC what else it should do to effect cure while at the same time denying that any confidential or proprietary information had been disclosed. Given the duration and nature of the breach, the Court is skeptical that cure is possible, but here WPI and Wischermann did not even attempt to remedy past harm caused by years of disloyalty. Under these circumstances, the Court finds the breaches were not cured.

     5.  <u>Verdict</u>

It is undisputed that WPI is in default of the non-compete and confidentiality provisions of the Management Agreement. The Court finds that these provisions are material provisions of the agreement or, in the alternative, that failure to comply with these provisions collectively constitutes materiality or evidences a disregard for WPI's obligations under the Management Agreement. The Court further finds that WPI and Wischermann did not fully cure the default within 30 days or begin to cure within that time period and "diligently proceed []" to accomplish the cure. Therefore, termination for cause is appropriate under Section 17.2 and no termination fee is owed.

For the reasons stated, the Court finds in favor of NHC on WPI and Wischermann's claim for breach of contract.

**B. Breach of Fiduciary Duty**

NHC asserts that WPI and Wischermann violated their fiduciary duties by: (1) engaging in conduct directly adverse to NHC's interests by assisting another property owner to develop a competitor property just 1,500 feet away from the Westin; (2) breaching NHC's confidentiality by providing detailed information about the design, development, and operation of the Westin to WPI and its contractors to assist with the development of a competitor hotel project.

Following the bench trial, the Court found that NHC did not demonstrate that it suffered damages caused by WPI's disloyal conduct and entered judgment in favor of WPI and Wischermann on this claim.

The Sixth Circuit remanded for reconsideration of NHC's breach of fiduciary duty claim, ordering:

> On remand the district court should evaluate whether Wischermann and WPI owed NHC a fiduciary duty; if so, whether they breached their duty; and, if affirmative, whether forfeiture is an appropriate remedy. It may also consider whether a full forfeiture is required or whether a lesser amount is appropriate. *Cf. Wall Sys., Inc. v. Pompa*, 154 A.3d 989, 999-1002 (Conn. 2017).

*Wischermann Partners*, 2022 WL 2231934, at *5.

In order to recover for breach of fiduciary duty, a plaintiff must establish: "(1) the existence of a fiduciary duty (2) that was breached (3) proximately causing damages." *Pagliara v. Johnston Barton Proctor & Rose, LLP*, 708 F.3d 813, 818 (6th Cir. 2013) (citing *Morrison v. Allen*, 338 S.W.3d 417, 438 (Tenn. 2011)).

With regard to damages, the Tennessee Court of Appeals has held that "[i]t is not necessary that the [principal] suffer a loss" as a result of the breach of duty of loyalty. *Efird v. Clinic of Plastic and Reconstructive Surgery, P.A.*, 147 S.W.3d 208, 220 (Tenn. Ct. App. 2003). Even without a provable loss, an agent who breaches the duty of loyalty "may be required to disgorge any profit or benefit he received as a result of his disloyal activities," including "any compensation

25

paid by the [principal] during the period of breach." *Id*. "In addition, [an agent] who breaches the duty of loyalty may be required to surrender any compensation paid by the [principal] during the period of breach." *Id*. (citing *Baker v. Battershell*, 1986 WL 7602, at *6 (Tenn. Ct. App. Jul. 9, 1986)). "It does not make any difference that the services were beneficial to the principal, or that the principal suffered no provable damage as a result of the breach of fidelity by the agent." *Phansalkar*, 344 F.3d at 200 (cited favorably by *Efird*, 147 S.W.3d at 220); *see also* Restatement (Second) of Agency § 469 ("An agent is entitled to no compensation for conduct which is … a breach of his duty of loyalty"); Restatement (Third) of Agency § 8.01 *cmt. d(1)* ("Forfeiture may be the only available remedy when it is difficult to prove that harm to a principal resulted from the agent's breach or when the agent realizes no profit through the breach.").  Finally, breach of fiduciary duty "constitutes a material breach of the contract by the agent" and may allow the principal "to terminate the principal's relationship with the agent in advance of a time set for termination in any contract between them." Restatement (Third) of Agency § 8.01 *cmt. d, (1)*.

Forfeiture is an equitable remedy drawing from principles of restitution and unjust enrichment. *Id*., *cmt. b*. Whether forfeiture is an appropriate remedy, and the amount of forfeiture depends on the circumstances of the case. *See Efird*, 147 S.W.3d at 221 (stating that an employee who breaches the duty of loyalty *may* be required to forfeit compensation during the period of breach and remanding to determine damages under the circumstances of the case); *In re Omni Mechanical Contractors*, 114 B.R. 518, 541 (E.D. Tenn. 1990) (claim for recovery of disloyal agent's salary is based upon equitable principles and depends on the facts of each case); *see also* Restatement (Second) of Agency § 469, *cmts. a., b.* (discussing apportionment of compensation); (Restatement (Third) of Agency § 8.01, *cmt. d, (1)* (noting that although some cases require

forfeiture of all compensation paid over the period of disloyalty, the better rule permits courts to consider the specific circumstances).

Although Tennessee courts have recognized that disgorgement may be an appropriate remedy for breach of a duty of loyalty depending on the circumstances of the case, there is scant authority for the specific factors to be considered. *See Efird*, 147 S.W.3d at 220 (noting availability of remedy and remanding for consideration of damages); *In re Omni Mech. Contractors, Inc*., 114 B.R. 518, 541 (E.D. Tenn. 1990) (finding forfeiture of salary not warranted after considering the egregiousness, duration, and potential harm of the breach of loyalty); *Ram Tool & Supply Co., Inc. v. HD Supply Const. Supply, Ltd.*, No. M2013-02264-COA-R3-CV, 2016 WL 4008718, at *5 (Tenn. Ct. App. Jul. 21, 2016) (noting possibility of disgorgement as a remedy for breach of duty of loyalty).

In the opinion remanding the question of appropriateness of forfeiture in this case, the Sixth Circuit cited a relatively recent decision by the Supreme Court of Connecticut that identifies a list of factors "gleaned from existing jurisprudence" for a court to consider related to this issue. *Wischermann*, 2022 WL 2231934, at *5 (citing *Wall Sys., Inc. v. Pompa*, 154 A.3d 989, 999-1002 (Conn. 2017) (collecting cases)).[4] These factors include: the agent's duties, role, and degree of responsibility; the level of compensation; the frequency, timing and egregiousness of the disloyal acts; the willfulness of the disloyal acts; the extent or degree of the principal's knowledge of the agent's disloyal acts; the effect of the disloyal acts on the value of properly performed services; the potential for harm or actual harm to the principal and the principal's business as a result of the disloyal acts; the degree of planning taken by the agent to undermine the principal; and the

---

[4]     The parties agree that *Wall Sys., Inc. v. Pompa* accurately sets for the factors the Court should consider in deciding whether disgorgement and forfeiture are an appropriate remedy.  (*See* WPI Br., Doc. No. 234 at 8; NHC Br., Doc. No. 231 at 24).

adequacy of other available remedies. In *Wall*, the court observed that "the judicial task is to search for a fair and reasonable solution in light of the relevant considerations and to avoid unjust enrichment to either party." *Wall*, 154 A.2d at 738 (citation modified) (citing *Cameco, Inc. v. Gedicke*, 724 A.2d 783, 791 (N.J. 1999); and *Hartford Elevator, Inc. v. Lauer*, 289 N.W.2d 280, 287 (Wisc. 1980)).

Assuming the Wischermann defendants breached their fiduciary duties to NHC by providing NHC's information to Pizzuti and others and otherwise assisting in the development of The Joseph, considering the factors set forth in *Wall*, the Court finds forfeiture of amounts paid to WPI during the period of breach is not warranted.

First, other than the breaches of confidentiality and non-competition, the Wischermann defendants' performance under the Management Agreement was not adversely affected by the divided loyalty. Wischermann secured the Westin brand and opened the hotel.

Second, WPI was paid less than market value for services performed during the pre-opening phases of the Westin. They agreed to this payment structure in exchange for the 10-year Management Agreement, which included a termination fee in the event of termination without cause. WPI estimates it lost approximately $600,000 on pre-opening services.

With regard to the frequency, timing, and egregiousness of the disloyal acts, it is undisputed that Wischermann and WPI provided NHC's information and otherwise assisted Pizzuti in the development of The Joseph from the outset, and that they did so openly and without contrition. Although they were not hiding the relationship with Pizzuti, they were not forthcoming either. Indeed, when confronted, Wischermann obfuscated and delayed. All of this, however, is offset by the minimal harm inflicted on NHC's business. Pizzuti would have developed The Joseph even

28

without Wischermann's help. Most detrimental was the irreparable harm to NHC's trust in Wischermann and WPI.

The extent or degree of the principal's knowledge of the agent's disloyal acts is particularly relevant here. There is no indication that NHC knew that Wischermann was freely sharing NHC's confidential and proprietary information with Pizzuti. However, the evidence strongly suggests that NHC knew that Wischermann and WPI were working with Pizzuti on another project in Nashville as early as 2015. While the Management Agreement requires any waiver of the non-compete provision to be in writing (*see* Section 23.4), for purposes of determining whether the equitable remedy of forfeiture is appropriate, the Court finds it highly relevant that, even if NHC did not know WPI had entered into a formal consulting agreement with Pizzuti for The Joseph project, it knew Wischermann was working with Pizzuti on a Nashville project in some capacity.

Finally, remedies other than forfeiture are available. As discussed above, NHC terminated the Management Agreement for cause and therefore is not obligated to pay the termination fee. Even if NHC does not obtain forfeiture of amounts paid during the period of disloyalty, WPI provided services at a discounted rate with the expectation of recouping losses over the term of the Management Agreement. Because the Management Agreement was terminated for cause without payment of the termination fee, WPI and Wischermann effectively forfeited their ability to recoup these losses. The Court finds this is an equitable result considering the nature of the breach and the relative economic impact on the parties.

The Court previously found that NHC had not demonstrated that its anticipated future loss of net income resulted from WPI's or Wischermann's disloyal conduct. (Doc. No. 208 at 14). Because forfeiture of amounts paid to WPI and Wischermann is not warranted under the facts of this case, WPI and Wischermann are not liable to NHC on the breach of fiduciary duty claim.

## IV. CONCLUSION

For the reasons stated, upon reconsideration of WPI's claim for breach of contract and NHC's claim for breach of fiduciary duty, the Court concludes that that NHC did not breach the Management Agreement and is not liable to WPI for the termination fee. The Court also concludes that WPI and Wischermann are not liable to NHC for breach of fiduciary duty.

An appropriate Order shall enter.

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE